IN THE

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 24-11298

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

Versus

CEDRICK HILL,

Defendant-Appellant.

_____

A DIRECT APPEAL OF A CRIMINAL CASE
FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

_____

INITIAL BRIEF

LEIGH ANN WEBSTER
Georgia State Bar Number: 968087
SYDNEY R. STRICKLAND
Georgia State Bar Number 418591
Strickland Webster, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, GA 30316
404-590-7967
Attorneys for Cedrick Hill

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

versus                        APPEAL NO. 24-11298

CEDRICK HILL,

     Defendant - Appellant.
_____/

<u>CERTIFICATE OF INTERESTED PARTIES</u>

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. Rule 26.1-1, counsel for certifies that the following listed attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal:

Counsel hereby certifies that the following may have an interest in the outcome of this appeal:

1. 1 Anand, Hon. Justin S. – Magistrate Judge, Northern District of Georgia;

2. Barron, Lynsey Morris – Former Counsel for Defendant/Appellant;

3. Carrico, Matthew S. – Assistant United States Attorney, Northern District of Georgia;

4. Durrett, Saraliene – Former Counsel for Defendant/Appellant;

5. Gilbert, Emily – Former Counsel for Defendant/Appellant;

6. Glickman, Robert Alan – Former Counsel for Defendant/Appellant;

7. Kaplan, Nicole – Former Counsel for Defendant/Appellant;

8. Kelly, Laila Azzuhara – Former Counsel for Defendant/Appellant;

9. Larkins III, Hon. John K. – Magistrate Judge, Northern District of Georgia;

10. Morris, Jessica Celina – Assistant United States Attorney, Northern District of Georgia;

11. Schechtman, Noah – Assistant United States Attorney, Northern District of Georgia;

12. Thomas, Brandon Alexander – Former Counsel for Defendant/Appellant;

13. Totenberg, Hon. Amy – District Judge, Northern District of Georgia;

14. Williams, Rodney – Former Counsel for Defendant/Appellant;

15. Sneed, Sekret T. – Assistant United States Attorney in related case, Northern District of Georgia;

16.Smith, Cynthia Beckwith – Former Assistant United States Attorney in related case, Northern District of Georgia;

17.Goss, Dahil Dueno – Former Assistant United States Attorney in related case, Northern District of Georgia;

18.Mendel, Gabriel Adam – Assistant United States Attorney in related case, Northern District of Georgia;

19.Taylor, Kristen Shannon; Department of Justice, District of Columbia;

20.Davis, Libby Skye – Assistant United States Attorney in related case, Northern District of Georgia;

21.Brown, Michael John – Former Assistant United States Attorney in related case, Northern District of Georgia;

22.Staton, Rebecca A. – Assistant United States Attorney in related case, Northern District of Georgia;

23.Klapman, Sarah – Assistant United States Attorney in related case, Northern District of Georgia;

24.Marshall, Devonta – Co-Defendant in related case;

25.Michaels, Sandra Louise – Counsel for Co-Defendant Devonta Marshall in related case;

26.Brown, Terry – Co-Defendant in related case;

27. Hall, Andrew – Counsel for Co-Defendant Terry Brown in related case;

28. Bouchard, David Holmes – Former Counsel for Co-Defendant Terry Brown in related case;

29. Tolley, Edward D. – Former Counsel for Co-Defendant Terry Brown in related case;

30. Lietz III, Warren Carl – Former Counsel for Co-Defendant Terry Brown in related case;

31. Todd, Travis – Co-Defendant in related case;

32. Williams, Bret R. – Counsel for Co-Defendant Travis Todd in related case;

33. Corso, Arturo – Former Counsel for Co-Defendant Travis Todd in related case;

34. Clayton, Wallace Carter – Former Counsel for Defendant Travis Todd in related case;

35. Riley, Demario – Co-Defendant in related case;

36. Hollingsworth, William Boyd – Counsel for Co-Defendant Demario Riley in related case;

37. Sydnor Jr., Clarence Arthur – Counsel for Co-Defendant Demario Riley in related case;

38. Preston, Monique – Co-Defendant in related case;

39. Thompson, Teri L. – Counsel for Co-Defendant Monique Preston;

40. Webster, Leigh Ann – Counsel for Defendant/Appellant; Former Counsel for Co-Defendant Tremaine Garrison in related case;

41. Garrison, Tremaine – Co-Defendant in related case;

42. Brown, Sheena – Co-Defendant in related case;

43. Worthington Sr., Beau – Counsel for Co-Defendant Sheena Brown in related case;

44. Balcazar, Erick – Co-Defendant in related case;

45. Holmes, Samuel Ray – Counsel for Co-Defendant Erick Balcazar in related case;

46. Lovell, John R. – Counsel for Co-Defendant Erick Balcazar in related case;

47. Mazloom, Maziar – Former Counsel for Co-Defendant Erick Balcazar in related case;

48. Ponder, Thomas Eric – Counsel for Co-Defendant Erick Balcazar in related case;

49. Arceneaux, Fred – Co-Defendant in related case;

50. Secret, Akil K. – Counsel for Co-Defendant Fred Arceneaux in related case;

51. Ansley, Adrian – Co-Defendant in related case;

52. Steel, Colette – Counsel for Co-Defendant Adrian Ansley in related case;

53. Andrews, Linnie – Co-Defendant in related case;

54. Citronberg, Robert H. – Counsel for Co-Defendant of Linnie Andrews in related case;

55. Smiley, Earl – Co-Defendant in related case;

56. McMahon, Patrick Francis – Counsel for Co-Defendant Earl Smiley in related case;

57. Reed, Wajzim – Co-Defendant in related in case;

58. O'Brien, Dennis Craig – Counsel for Co-Defendant Wajzim Reed in related case;

59. Hawkins, J'Mon – Co-Defendant in related case;

60. Timmer, Sarah M. – Counsel for J'Mon Hawkins in related case;

61. Dawkins, Calmetrius – Co-Defendant in related case;

62. Campbell, Mark A. – Counsel for Calmetrius Dawkins in related case;

63. Shivers, Westly – Co-Defendant in related case;

64. Durrett, Saraliene – Counsel for Co-Defendant Westly Shivers in related case;

65. Russell, Marcus – Co-Defendant in related case;

66. Marshall, David D. – Counsel for Co-Defendant Marcus Russell in related case;

67. Dodge, Whitman Matthew – Former Counsel for Co-Defendants Marcus Russell and Cetera Bowles-Griffin in related case;

68. Williams, Raekwon – Co-Defendant in related case;

69. Key, Joseph Scott – Counsel for Co-Defendant in related case;

70. Nalls, Alfonzo – Co-Defendant in related case;

71. Wilson, Roger C. – Counsel for Co-Defendant Alfonzo Nalls in related case;

72. Bowles-Griffin, Cetera – Co-Defendant in related case;

73. Spencer, R. Gary – Counsel for Co-Defendant Cetera Bowles-Griffin in related case;

74. Powell, Patrick Anthony – Former Counsel for Co-Defendant Cetera Bowles-Griffin in related case;

75. Maheia, Kierra – Co-Defendant in related case;

76. Little Jr., Samuel Fenn – Counsel for Co-Defendant Kierra Maheia in related case;

77. Rosser, Jimmy – Co-Defendant in related case;

78. Ertel, Jeffrey Lyn – Counsel for Co-Defendant Jimmy Rosser in related case;

79. Kaplan, Nicole M. – Counsel for Co-Defendant Jimmy Rosser in related case;

80. Asberry, Brandon – Co-Defendant in related case;

81. Howard, James Ward – Counsel for Co-Defendant Brandon Asberry in related case;

82. Jackson, Michael – Co-Defendant in related case;

83. Panitch, Esther Dina Feuer – Counsel for Co-Defendant Michael Jackson in related case;

84. Johnson, Vionnette Reyes – Former Counsel for Co-Defendant Michael Jackson in related case;

85. Reed, Tashied – Co-Defendant in related case;

86. Finlayson, L. Burton – Counsel for Co-Defendant Tashied Reed in related case;

87. Riley III, Joseph – Co-Defendant in related case;

88. Cognac, Paul M. – Counsel for Co-Defendant Joseph Riley III in related case;

89. Clark, Tyrone – Co-Defendant in related case;

90. Saul, Michael H. – Counsel for Co-Defendant Tyrone Clark in related case;

91. Ross, Michael Tyler – Counsel for Co-Defendant Tyrone Clark in related case;

No publicly-traded company or corporation has an interest in the outcome of this appeal or case.

Dated: this 23rd day of June, 2025.

/s/ Leigh Ann Webster
Leigh Ann Webster
Georgia Bar No. 968087
Attorney for Cedrick Hill

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile: (404) 393-3617
law@stricklandwebster.com

TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ................................................ C1-9

TABLE OF CONTENTS............................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ......................................... iii

STATEMENT OF TYPE SIZE AND STYLE...................................................... iv

TABLE OF AUTHORITIES ............................................................................ v

STATEMENT OF JURISDICTION ..................................................................x

STATEMENT OF THE ISSUES.......................................................................1

STATEMENT OF THE CASE ........................................................................3

    I.   Course of Proceedings..................................................................3

    II.   Statement of Facts.......................................................................3

STANDARDS OF REVIEW............................................................................19

SUMMARY OF THE ARGUMENT ..................................................................20

ARGUMENT AND CITATIONS OF AUTHORITY.........................................22

    I.   The district court abused its discretion in denying the motion to sever to allow Mr. Hill to testify as to Count 3. ...............................22

    II.   The evidence at trial established multiple conspiracies, not the single conspiracy charged in the indictment.........................................27

        a.   There was a material variance between the indictment and the government's evidence, which established at least two separate conspiracies. ....................................................................27

            1.   A properly instructed and reasonable jury could not have determined beyond a reasonable doubt that a single conspiracy existed. ..................................................................................29

                a. Mr. Hill was not a member of the NTG conspiracy................29

                b. At most, there was a rimless hub-and-spoke conspiracy, with Sartor at the hub.........................................................................36

            2.   Mr. Hill was prejudiced by the material variance from the indictment. ...............................................................................38

b.    The district court plainly erred by not giving a multiple conspiracies instruction. ...................................................................41

c.    The district court plainly erred by admitting statements from NTG members because it did not constitute co-conspirator hearsay. ...44

III. The district court plainly erred by admitting improper testimony through the case agents. ...........................................................................45

a.  The case agents provided improper opinion testimony while also testifying as fact witnesses. ......................................................................48

b.  The government admitted documents that constituted improper hearsay and violated the Confrontation Clause. .....................................57

IV. The cumulative prejudice from the errors identified above requires reversal. ..................................................................................................58

V.  Mr. Hill's sentence is substantively unreasonable because the district court expressly considered an impermissible sentencing factor — the fact that Mr. Hill exercised his constitutional right to trial — when imposing sentence. .................................................................................................59

CONCLUSION .........................................................................................62

CERTIFICATE OF COMPLIANCE............................................................63

CERTIFICATE OF SERVICE....................................................................64

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure Fed.R.App.P. 34(a), the Defendant-Appellant requests oral argument, as it would significantly aid in the decisional process.

## STATEMENT OF TYPE SIZE AND STYLE

Pursuant to 11th Cir. R. 28-2 (d), counsel for Appellant hereby certifies that the size and style of type used in this brief is Book Antiqua 14 PT.

## TABLE OF AUTHORITIES

<u>SUPREME COURT CASES</u>

*Crawford v. Washington*, 541 U.S. 36 (2004) ........................................................58

*Davis v. Washington*, 547 U.S. 813 (2006) ...........................................................58

*Kotteakos v. United States*, 328 U.S. 750 (1946) ...................................................38

*Rehaif v. United States*, 588 U.S. 225 (2019) ........................................................42

*Smith v. Arizona*, 602 U.S. 779 (2024) ..................................................................59

*Washington v. Texas*, 388 U.S. 14 (1967) ..............................................................28

<u>OTHER CASES</u>

*Baker v. United States,* 401 F.2d 958 (D.C. Cir. 1968) ...................................23, 27

*Baker v. United States*, 412 F.2d 1069 (5th Cir. 1969) ....................................61, 62

*Cross v. United States*, 335 F.2d 987 (D.C. Cir. 1964) ..........................................23

*Smith v. Wainwright*, 664 F.2d 1194 (11th Cir. 1981) ...........................................61

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023) ...........................................34

*United States v. Alvarez*, 755 F.2d 830, 843 (11th Cir. 1985) ...............................25

*United States v. Andrews*, 953 F.2d 1312 (11th Cir. 1982) ...................................34

*United States v. Calderon*, 127 F.3d 1314 (11th Cir. 1997) ..........29, 30, 33, 43, 44

*United States v. Caldwell*, 589 F.3d 1323 (10th Cir. 2009) ...................................34

*United States v. Castro*, 89 F.3d 1443 (11th Cir. 1996) .........................................28

*United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004) ....................................38

*United States v. Corbin*, 734 F.2d 643 (11th Cir. 1984) ...........................23, 24, 26

*United States v. Coy*, 19 F.3d 629 (11th Cir. 1994)...................................29, 30, 39

*United States v. Curtin*, 78 F.4th 1299 (11th Cir. 2023)................................20, 60

*United States v. Dekle*, 165 F.3d 826 (11th Cir. 1999) ........................................33

*United States v. Dennis*, 237 F.3d 1295 (11th Cir. 2001) .....................................20

*United States v. Franklin*, 2022 WL 5337453 (11th Cir. Oct. 7, 2022) ...............53

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004)....................................47

*United States v. Glinton*, 154 F.3d 1245 (11th Cir. 1998)...............................29, 39

*United States v. Haines*, 803 F.3d 713 (5th Cir. 2015)..........................................48

*United States v. Hawkins*, 934 F.3d 1251 (11th Cir. 2019)...47, 48, 49, 52, 54, 57,

................................................................................................................................58

*United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002) ......................................20

*United States v. Holt*, 777 F.3d 1234 (11th Cir. 2015)..........................................35

*United States v. Hutchings*, 757 F.2d 11 (2d Cir. 1985) ..................................61, 62

*United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010)..........................................60

*United States v. Jernigan*, 341 F.3d 1273  (11th Cir. 2003) .................................42

*United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995)..........................................42

*United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) ........................................44

*United States v. Medina-Cervantes*, 690 F.2d 715 (9th Cir. 1982) ......................61

*United States v. Meester*, 762 F.2d 867 (11th Cir. 1985) ......................................20

*United States v. Mize*, 814 F.3d 401 (6th Cir. 2016) .............................................37

*United States v. Mosquera*, 886 F.3d 1032 (11th Cir. 2018) ................................60

*United States v. Pacchioli*, 718 F.3d 1294 (11th Cir. 2013)............................38, 39

*United States v. Pendergrass*, 995 F.3d 858 (11th Cir. 2021) ..................48, 49, 54

*United States v. Perry*, 14 F.4th 1253 (11th Cir. 2021) ...................................49, 57

*United States v. Plate*, 839 F.3d 950 (11th Cir. 2016) ....................................60, 61

*United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008)........................................60

*United States v. Ramirez*, 426 F.3d 1344 (11th Cir. 2005)...................................23

*United States v. Ransfer*, 749 F.3d 914 (11th Cir. 2014)......................................58

*United States v. Reeves*, 742 F.3d 487 (11th Cir. 2014) .................................34, 35

*United States v. Russell*, 957 F.3d 1249 (11th Cir. 2020) ..............................20, 46

*United States v. Stowell*, 947 F.2d 1251 (5th Cir. 1991) .......................................44

*United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008)......................................33

*United States v. Velasquez Velasquez*, 524 F.3d 1248 (11th Cir. 2008)...............61

*United States v. Wall*, 116 F.4th 1285 (11th Cir. 2024) ........................................57

*United States v. Wenxia Man*, 891 F.3d 1253 (11th Cir. 2018) .....................41, 45

*United States v. Williamson*, 482 F.2d 508 (5th Cir. 1973)..................................24

vii

STATUTES

18 U.S.C. § 111 .................................................................3, 25, 26

18 U.S.C. § 3553(a) ......................................................................61

21 U.S.C. § 841 ...............................................................................3

21 U.S.C. § 846 ...............................................................................3

28 U.S.C. § 1291 ......................................................................... ix

RULES

11th Cir. R. 28-2 (d)....................................................................iv

Federal Rule of Appellate Procedure 32 .........................................64

Federal Rule of Appellate Procedure 34 .................................... iii, 26

Federal Rule of Appellate Procedure 4 ............................................x

Federal Rule of Evidence  404(b)...............................................14, 59

Federal Rule of Evidence 602.......................................................47

Federal Rule of Evidence 701.................................................47, 48

Federal Rule of Evidence 702.................................................47, 48

Federal Rule of Evidence 801 ...........................................41, 45, 46, 58

Federal Rule of Evidence 802.......................................................58

Federal Rule of Criminal Procedure 8 .............................................4

Federal Rule of Criminal Procedure 14 ...........................................4

## OTHER AUTHORITIES

U.S. Const. amend. VI.......................................................................................62

## STATEMENT OF JURISDICTION

The Eleventh Circuit Court of Appeals has jurisdiction to consider this case pursuant to 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4. This case involves a direct appeal of a criminal conviction and sentence imposed in the United States District Court for the Northern District of Georgia, Atlanta Division.

STATEMENT OF THE ISSUES

I.      The district court abused its discretion in denying the motion to sever to allow Mr. Hill to testify as to Count 3.

II.     The evidence at trial established multiple conspiracies, not the single conspiracy charged in the indictment.

   a. There was a material variance between the indictment and the government's evidence at trial because it established at least two separate conspiracies.

   b. The district court plainly erred by not giving a multiple conspiracies instruction.

   c. The district court plainly erred by admitting statements from NTG members because it did not constitute co-conspirator hearsay.

III.    The district court plainly erred by admitting improper testimony through the case agents.

IV.     The cumulative prejudice from these errors requires reversal.

V.      Mr. Hill's sentence is substantively unreasonable because the district court expressly considered an impermissible sentencing

1

factor—the fact that Mr. Hill exercised his constitutional right to trial—when imposing sentence.

STATEMENT OF THE CASE

## I. Course of Proceedings

Cedrick Hill was charged with conspiring to distribute and possess with intent to distribute at least 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 21 U.S.C. § 846 (Count 1); possessing with intent to distribute the same, in violation of § 841(a)(1) and 841(b)(1)(A) (Count 2); and using a deadly and dangerous weapon—a motor vehicle—to assault a federal officer (Paul Szabo) engaged in the performance of official duties, inflicting bodily injury, in violation of 18 U.S.C. § 111 (Count 3). (Doc. 59). Mr. Hill was convicted on all counts after trial and was sentenced to 312 months. (Docs. 208, 217).

## II. Statement of Facts

### A. Indictment

Mr. Hill was initially indicted on a drug conspiracy charge with 29 other defendants that were alleged to be members or associates of the Nine Trey Gangsters ("NTG") Blood Gang. (N.D. Ga. case number 1:16-cr-427, doc. 33). He was later indicted in the instant case. (Doc. 1). Eventually, this indictment was superseded to add the charges from the initial NTG case (Counts 2 and 3). (Doc. 59). Specifically, Mr. Hill was charged with

conspiring with Erick Balcazar, Tyrone Clark, Joseph Riley, Gary Sartor, Travis Todd, Demario Ridley, and others. (*Id.* at 1).

B. Severance Motion

Mr. Hill moved for misjoinder and severance, pursuant to Fed.R.Crim.P. 8(a) and Federal RuleCriminal Procedure 14(a), seeking to sever Counts 1 and 2 from Count 3. (Doc. 77). He argued that joinder was improper because the drug charges were insufficiently similar to the assault charge, and because of the time gap between the offenses. (*Id.* at 1-4; *see also* doc. 59). Even if properly joined, severance was required so that he could testify about the assault charge, but not the drug counts, because he had an affirmative defense to the assault charge—that he had a good-faith belief that self-defense was necessary to protect against an assault by a private citizen. (Doc. 77 at 4-11). Mr. Hill was the best situated to testify about his own knowledge and state of mind. (*Id.* at 6-7). However, Mr. Hill had a strong interest in remaining silent as to the drug counts. (*Id.* at 8).

The district court determined that joinder was appropriate, that severance was unnecessary, but that given Mr. Hill's proposed testimony, it was appropriate to take other measures. (Doc. 111 at 3-6). Accordingly, the court "intend[ed] to grant appropriately tailored relief regarding specific

4

scope limitations in the Government's cross-examination of the Defendant concerning Counts I and II, *if* the Defendant chooses to testify, after requisite pre-trial motions regarding such scope limitations from the parties have been filed." (*Id.* at 7-8). The court would consider other measures if such relief could not be reasonably implemented. (*Id.* at 8).

C. Trial

i.    *Gang Evidence*

The government first called Task Force Officer Joshua Thompson. (Doc. 223 at 52-53).  Despite not offering Thompson as an expert, the government asked extensive questions about Thompson's prior training and experience specifically about gangs, leading to over eight pages of testimony.  (*Id.* at 53-61, 66).  Thompson testified about gang activity, including the rise in gang activity and violence committed by gangs, including murder. (*Id.* at 55-58).  After Thompson testified, the government called FBI Special Agent Paul Szabo, who also began his testimony by describing his experience and training.  (Doc. 224 at 87-94).

Thompson testified that the "motivation for the gang primarily is money and stature," which he learned through reviewing thousands and thousands of hours of wiretaps and recorded jail calls, and reading letters

and emails. (*Id.* at 58). His experience included debriefing gang members and discussing phrases and terminology used in gang activity and narcotics trafficking. (*Id.* at 66-67).

The government then directed Thompson to the investigation into NTG. (*Id.* at 61). In late 2015, the Gwinnett County Police Department contacted the FBI because an NTG member had been killed, and they believed that the murder was directed by a state inmate, Gordon Evans, who was also an NTG member. (*Id.*). They arrested and charged two people with murder, and Evans was also charged because he ordered the homicide using a contraband cell phone. (*Id.*). As a result of that investigation, the federal authorities began investigating the NTG gang in Atlanta. (*Id.* at 62).

In the middle of significant testimony about NTG, Thompson testified that Mr. Hill was not a member of NTG. (*Id.*). Thompson then began describing the history of NTG. (*Id.*). Mr. Hill objected to relevance; the court directed the government to "keep it quick." (*Id.* at 62-63). Thompson described how the gang started in Rikers Island in July 1993, eventually leading to a "mini riot." (*Id.* at 63). The court found that it was not relevant and instructed the government to move on. (*Id.* at 63-64). However, the

6

government continued to elicit NTG's history and discussed how the gang was organized. (*Id.* at 64).

Thompson explained that NTG engaged in criminal activity to make money and to further the status of the gang. (*Id.* at 64-66; *see also id.* at 60-61 (dealing in narcotics was the gang's "biggest criminal moneymaker")). NTG specifically was engaged in "[n]arcotics and drug dealing, violence, robberies, burglaries," some fraud, but "again, violent crime, murder, aggravated assaults." (*Id.* at 65). Thompson acknowledged that gangs will go outside the gang to get drugs. (*Id.*).

Thompson described Mr. Hill's role as the "broker and supplier to Tyrone Clark, who was the fifth floor of the Nine Trey Bloods at the time." (*Id.* at 68). Clark was acting on behalf of Gary Sartor, who was in prison and an NTG fifth floor. (*Id.* at 68-69). Sartor would use gang members to help him get and distribute drugs. (*Id.* at 69).

Authorities wiretapped Clark's phone number, which they learned through the Gwinnett County investigation, because they believed Clark was involved in the murder from that case. (*Id.* at 76-77). Joseph Riley's phone was also a target of the wiretap, as Riley was another NTG fifth floor. (*Id.* at 78). Riley was "the highest ranking member in the State of Georgia of

7

that particular set of the Nine Trey Bloods," meaning that he "had pretty much ultimate authority for this gang."  (*Id.* at 78-79; *see also* doc. 224 at 97).

The government introduced a subset of calls and transcripts from the wiretaps (Gov't Exhs. 5, 6), as well as logs of those calls (Gov't Exhs. 7, 8). (Doc. 223 at 85-89).  The government then played numerous calls from the wiretaps for the jury.  (Doc. 223 at 121-150).  As the government played the calls, Thompson and Szabo explained these phone calls to the jury.  (*Id.*; doc. 224 at 8-33, 104-168).

### ii.    *October 1, 2016 Transaction*

Based on these wiretaps, law enforcement anticipated a drug transaction at 759 Charlotte Place on October 1, 2016, in which Clark would purchase methamphetamine from Mr. Hill "via Erick Balcazar."  (Doc. 223 at 133-34; doc. 224 at 109).  Thompson testified that Clark reached out to Mr. Hill—his cousin—and asked him "to go through his supplier or someone he knew to get methamphetamine."  (Doc. 223 at 68-69).

In a phone call, Clark told Riley that he needed "to go get the money for [Sartor], bro."  (*Id.* at 144-45).  Clark said he needed the money for "the play, I'm fixing to bust a move for him."  (*Id.* at 145).  Thompson testified that "the play means the deal, the drug deal."  (*Id.*).  He also testified that

"I'm fixing to bust a move for him" meant that Clark was "going to be basically the intermediary or the middleman for Sartor because Sartor is obviously in prison at Washington State Prison." (*Id.*). Szabo testified similarly: that Sartor had arranged the deal, but others were executing the transaction for him. (Doc. 224 at 111, 151-52 (Sartor was in prison and Mr. Riley was "helping facilitating his drug distribution")).

Sartor used 759 Charlotte Place to store and distribute drugs, and Riley and Clark helped facilitate that. (Doc. 223 at 151 (also stating that the methamphetamine "had been purchased by Tyrone Clark for Gary Sartor from Erick Balcazar with the help of Cedrick Hill"); doc. 224 at 111 ("[t]his particular drug deal is being arranged by Gary Sartor, one of the gang's leaders within the prison system)")). "[T]he main benefactor of the whole thing was Gary Sartor, who was the fifth floor gang leader from the Nine Trey Bloods who was at Washington State Prison in Davisboro, Georgia, at the time. So Clark was the facilitator and the go-between for that part." (Doc. 224 at 7).

In another call, when Mr. Hill referenced "pull[ing] up to Bankhead," Szabo stated that this was a reference to 759 Charlotte Place, and that it was "a reference to needing to go to that particular house [that] was a drug spot

or a drug distribution location that was run by Joseph Riley." (*Id.* at 111). Therefore, Szabo opined that Clark was "saying that that is where the money is going to be and Mr. Hill and his associate, Mr. Balcazar, need to go to Bankhead to make that delivery." (*Id.* at 111-12).

Agents conducted surveillance at the Charlotte Place address on October 1, 2016, and saw cars associated with Balcazar and Riley arrive. (Doc. 224 at 6-5; doc. 225 at 73). Thompson recounted how agents saw Riley pull out a bag, which they believed to be money that Riley was holding for Sartor, and take it inside. (Doc. 223 at 150-51; *see also* doc. 224 at 122).

Agents had local law enforcement stop Balcazar's car. (*Id.* at 151-52; doc. 224 at 6-7). APD attempted to pull over the car, but it took off, and ultimately APD terminated their pursuit. (Doc. 224 at 123-24). Based on information in a wiretapped call, law enforcement located the vehicle at an abandoned house, but not the car's occupants. (*Id.* at 125-26, 131). They found Mr. Hill's driver's license and information with Balcazar's name in the car. (*Id.* at 133-35).

Later that day, authorities intercepted a call between Mr. Hill and Clark, in which Mr. Hill stated, "we just had to high speed them folks." (*Id.* at 9-10). Thompson testified that by "high speed them," Mr. Hill meant a

10

"[h]igh speed chase or trying to get away from the police." (*Id.* at 10). When Mr. Hill stated, "They followed us on down the street and blued us," Thompson testified that "blued us" "commonly referred to when police activate their blue lights to stop a vehicle." (*Id.* at 10). When Clark said, "the three of y'all just stay right there bro," Thompson testified that he was referring to Mr. Hill, Balcazar, and Balcazar's girlfriend. (*Id.* at 12).

The government introduced several phone calls in which Clark told others that "the plug" or Mr. Hill had been pulled over leaving the house after "serv[ing] Stacks," or Sartor. (Doc. 224 at 16-17, 20; Gov't Exh. 05-14141). In another call, Clark told Riley how they had lost the money in the car. (Gov't Exh. 005-14144A; Doc. 224 at 31). Riley described the loss of the money as "ugly," and Clark responded that "Migo" had to "go explain that to his people." (Gov't Exh. 005-14144A at 3).

In an October 3, 2016 call, Riley told Clark that the drugs were short, and that the drugs were losing weight because they were distributed while they were still wet. (Doc. 224 at 144). Ultimately, Riley informed Clark that he was owed additional product. (*Id.* at 145). Clark explained the situation in a call with Mr. Hill, (*id.* at 145-46), and then Mr. Hill, Balcazar, and Clark were captured on another phone call, (*id.* at 149). Balcazar explained that it

11

was delivered soon after it was made and it had not been allowed to dry long enough. (*Id.* at 149-50).

### iii. November 4, 2016 Transaction

Based on wire intercepts of Riley's phone, law enforcement anticipated another delivery on November 4, 2016, which Riley was facilitating for Sartor. (Doc. 224 at 151-52). Sartor referenced "Boot," and Szabo identified Boot as Chester Morgan, who was supposed to be picking up $38,000 from someone named Marcus Russell. (*Id.* at 153). Marcus Russell was never mentioned in the actual phone call. (*Id.* at 153; Gov't Exh. 006-514A). On November 4, 2016, Morgan dropped money off at 759 Charlotte Place, and the following day, he went back and picked up drugs for Sartor. (Doc. 225 at 169-70). Szabo interpreted a subsequent call between Riley and Sartor at length, including adding information from the investigation. (Doc. 224 at 155-59). For example, Szabo testified that Boot had "picked up the money from Mr. Russell who actually lives in Jesup, Georgia, so down in south Georgia, and driven it, delivered it to Joseph Riley. The money is there." (*Id.* at 156).

In a call at around 8:30 pm on November 4, Clark told Riley that he, Mr. Hill, and Balcazar were on the way with methamphetamine. (*Id.* at 167).

Later that night, Clark left the Charlotte Place address, and GSP stopped him and arrested him. (*Id.* at 168-70). Officers seized Clark's phone. (Doc. 225 at 12-13; Gov't Exh. 28). The government admitted the phone's contacts and the call list, which showed "Ced" saved in the phone and calls with "Ced" on November 4, 2016. (Doc. 225 at 5-9, 11; Gov't Exhs. 28A, 28B). It also showed communications with Riley and Sartor. (Doc. 225 at 5-9). Szabo testified that the call records were "consistent with the calling pattern of arranging the meet-up at 759." (*Id.* at 10).

The next day, agents saw Morgan depart from 759 Charlotte Place, presumably with the drugs, and they asked Georgia State Patrol ("GSP") to conduct a "whisper stop" of Morgan's car. (Doc. 225 at 13-14, 19). GSP seized three kilograms of methamphetamine and one pound of marijuana from the car. (*Id.* at 20-21, 131-33, 138, 141-42).

After Morgan was stopped, Sartor was recorded trying to get additional methamphetamine transported to south Georgia. (Doc. 225 at 48). Law enforcement identified a car driven by Monique Preston, noting that she was "a female who Mr. Sartor had recruited to do the pickup and do the delivery." (*Id.* at 48-49, 143-47). GSP stopped Preston and seized methamphetamine. (*Id.* at 50, 149-50; Doc. 226 at 54-68).

Morgan, a former NTG member, testified that if someone did not follow an order by an NTG leader, they could be violated, including being beaten up or murdered. (Doc. 225 at 154, 159-61). Morgan picked up the drugs in order to get out of the gang with Sartor's permission. (*Id.* at 167-69). Morgan did not know Mr. Hill and could not identify him. (*Id.* at 161-62).

The government played over objection a call between Riley, Sartor, and Courtney Goolsby — Clark's girlfriend — from the day after Clark was arrested. (Doc. 225 at 27-32, 36-37; Gov't Exh. 006-751a). In the call, they discussed getting in touch with Mr. Hill, who they did not appear to know. (*Id.*).

### iv.    *Federal Rule of Evidence 404(b) Evidence and Phone*

The government introduced evidence from a phone seized from Mr. Hill, and Szabo testified about the contents, although the extraction report showed that it was prepared by George D. McGee. (Doc. 225 at 58-60; Gov't Exhs. 89A, 89B, 89C at 1). The government introduced pictures from this phone through Jack Rogers, a Rule 404(b) witness. (Doc. 225 at 60-61; Doc. 226 at 79-84; Gov't Exhs. 89D-89K). Rogers testified that he had purchased methamphetamine from Mr. Hill on numerous occasions between February

14

and September 2017. (Doc. 226 at 86-98). The government used the photos from the phone to corroborate Rogers' testimony. (*Id.* at 88-95). Rogers' credibility was called into doubt by his outlandish efforts to cooperate with the government. (*Id.* at 98-99, 101-10, 122-29).

     *v.*     *January 5, 2018 Arrest*

Authorities arrested the defendants in the NTG indictment on October 18, 2017, but they were unable to arrest Mr. Hill then. (Doc. 226 at 133-38, 146-47). In January 2018, agents used phone data to determine that Mr. Hill was likely at a hotel in Atlanta. (*Id.* at 181-83). Szabo traveled to the hotel alone early in the morning of January 5, 2018, although his team was not scheduled to arrive until later. (*Id.* at 182-83; Doc. 227 at 35). Szabo was wearing regular clothes and was not identified as a law enforcement officer. (*Id.* at 186).

Eventually, Szabo saw Mr. Hill heading toward the exit and attempted to arrest him. (*Id.* at 191-92). Szabo wrapped his arms around Mr. Hill like a bear hug, identified himself, and told Mr. Hill that he was under arrest. (*Id.* at 192). As Szabo reached for his handcuffs, Mr. Hill ran back into the hotel, and Szabo chased him through the hotel. (*Id.* at 193-95). Mr. Hill ran to a white truck and opened the door; Szabo grabbed the car door

15

and tried to stop it from closing with Mr. Hill inside the car. (*Id.* at 195-97). Mr. Hill started the car, but Szabo testified that he could not remove his arm from the car door, so he was pinned to the truck. (*Id.* at 197). Although Szabo could not remove his arm from the truck to get off, he could get his firearm and "end[ed] up shooting down and in through what is a little opening in the door between the door and the frame down and in at the driver" to try to get Mr. Hill to stop. (*Id.* at 198-99; Doc. 227 at 48-50). His gun stopped firing, and at some point, he lost control of the firearm. (Doc. 226 at 200-01). Szabo denied that he was shooting "straight-on" at Mr. Hill, (doc. 227 at 50-53), but forensics showed that at least one bullet was shot straight into the headrest of the truck in nearly a horizontal line, (doc. 228 at 90-93, 96).

Mr. Hill eventually stopped the truck and said he had been shot. (*Id.* at 201). Mr. Hill helped Szabo off the vehicle, and they were both laying on the side of the road; Szabo called 911 and requested ambulances for both of them. (*Id.* at 202-03). Mr. Hill got back up and drove the truck back to the hotel without Szabo. (*Id.* at 204). There was a compilation video from different cameras of the chase, but it did not capture when Mr. Hill was shot. (Doc. 227 at 196-211; Gov't Exh. 146).

16

The government admitted evidence from a phone that was discovered near the hotel shortly after the incident with Szabo. (Doc. 228 at 12-13; Gov't Exhs. 85A-85K). Special Agent Jason Cleary testified about the evidence, although someone with the initials "jcm" conducted the examination. (Doc. 228 at 10, 12-13; Gov't Exh. 85A). This phone included outgoing messages about Mr. Hill being the last defendant not arrested, as well as searches and other records related to the case. (Doc. 228 at 14-29).

### vi.    Mr. Hill's Decision Not to Testify

Initially, Mr. Hill declined to testify. (Doc. 228 at 115-16). However, he later stated that he wanted to testify, but only as to Count 3. (Doc. 229 at 3-6). After the government argued, the court stated that Mr. Hill would be cross-examined without limitation. (*Id.* at 3-4, 6-7, 23-25, 31). The court stated that the limits described in its earlier order were "too hard to invent at this point in time." (*Id.* at 24). Its order meant that it could consider limitations, but that "there probably is none, frankly." (*Id.* at 25). Ultimately, Mr. Hill chose not to testify. (*Id.* at 53-54).

### D. Sentencing

Mr. Hill's guideline range was 324 to 405 months. (Doc. 290 at 123). The court found that there was not "a calculated decision to use the truck as

a weapon. The calculated decision was just get out of there." (*Id.* at 119, 139-40). The government argued for a 360-month sentence, partially because Mr. Hill "took his case to trial." (*Id.* at 124, 128). Mr. Hill requested 120 months, noting that Sartor and Clark had planned numerous violent acts, such that Mr. Hill should not receive a similar sentence. (*Id.* at 135-37). He explained the severe physical consequences he had experienced from being shot in the stomach three times without receiving adequate medical care while incarcerated. (*Id.* at 132-35).

The court acknowledged Mr. Hill's argument about Sartor and Clark, but explained that "[t]hey entered into a deal. . . [Y]ou could have entered into a deal too." (*Id.* at 140). It stated that although it was "absolutely your right to go to trial, . . . it was an enormous risk. . . . [T]here was a lot of evidence against you – a lot." (*Id.* at 140). Therefore, "this is not a ten-year sentence because you didn't basically come to some agreement earlier on. That is the reality. This has taken enormous resources." (*Id.* at 141). The court sentenced Mr. Hill to 312 months. (*Id.* at 142). Mr. Hill objected to the substantive reasonableness of the sentence. (*Id.* at 147).

18

STANDARDS OF REVIEW

This Court reviews the district court's denial of a motion to sever for an abuse of discretion. *United States v. Hersh*, 297 F.3d 1233, 1241 (11th Cir. 2002).

This Court reviews unpreserved issues for plain error. *United States v. Russell*, 957 F.3d 1249, 1252 (11th Cir. 2020) (evidentiary issues); *United States v. Meester*, 762 F.2d 867, 879-80 (11th Cir. 1985) (multiple conspiracies instruction). Plain error requires that the defendant show (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and (4) if the first three prongs are satisfied, this Court may exercise its discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* This Court also reviews a material variance claim for plain error, but the test for plain error appears to be substantially the same as the underlying test: (1) that a material variance occurred, and (2) that the defendant suffered substantial prejudice. *United States v. Dennis*, 237 F.3d 1295, 1300 (11th Cir. 2001).

This Court reviews a sentence's substantive reasonableness for an abuse of discretion. *United States v. Curtin*, 78 F.4th 1299, 1311 (11th Cir. 2023).

## SUMMARY OF THE ARGUMENT

The district court abused its discretion by denying Mr. Hill's motion to sever Count 3, given the separation in time and evidence between the drug offenses and the assault. The denial of the severance resulted in compelling prejudice to Mr. Hill because he was not able to testify at trial as to Count 3, and his knowledge and understanding were critical to his defense on that count.

Contrary to the single conspiracy charged in the indictment, the evidence at trial plainly established two separate conspiracies—the NTG conspiracy that included, *inter alia*, Sartor and Clark, and another conspiracy that involved Mr. Hill and Balcazar. The evidence established that Mr. Hill and Balcazar were not a part of the NTG conspiracy. This material variance prejudiced Mr. Hill because it allowed the government to introduce substantial evidence about NTG, including enormous amounts of coconspirator hearsay. The amount of the NTG evidence presented at trial clearly surprised Mr. Hill, and there was a substantial risk that the jury transferred the guilt of the alleged coconspirators to Mr. Hill. For these reasons, the district court plainly erred by failing to instruct the jury on multiple conspiracies. Further, the district court plainly erred by admitting

20

coconspirator hearsay, Mr. Hill was not a member of the same conspiracy as the declarants.

The district court plainly erred by permitting the government's case agents to improperly testify at trial. The agents testified to both fact and expert testimony. They testified to conclusions that should have been left for the jury to make, and they testified as improper summary witnesses, as the government used them to present the entire case. Finally, they interpreted—at length—phone calls and language that should have been obvious to the ordinary juror.

Finally, Mr. Hill's sentence is substantively unreasonable because the district court considered an impermissible factor in imposing sentence—that Mr. Hill exercised his constitutional right to a trial.

ARGUMENT AND CITATIONS OF AUTHORITY

I.    **The district court abused its discretion in denying the motion to sever to allow Mr. Hill to testify as to Count 3.**

"Prejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence." *Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1964). When offenses are joined, the defendant "may be confronted with a dilemma: whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other." *Baker v. United States*, 401 F.2d 958, 977 (D.C. Cir. 1968).

To determine whether severance is required, this Court considers whether (1) Count 3 is "clearly distinct in time, place and evidence" from Counts 1 and 2; (2) Mr. Hill's proffered testimony regarding Count 3 was "important"; and (3) Mr. Hill showed a "strong need" not to testify on Counts 1 and 2. *United States v. Corbin*, 734 F.2d 643, 648-49 (11th Cir. 1984). This Court must reverse if Mr. Hill shows a clear abuse of discretion resulting in compelling prejudice. *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005).

Here, the district court abused its discretion in denying the motion for severance, and this resulted in compelling prejudice because Mr. Hill was unable to present his chosen defense.   First, as the district court acknowledged, Count 3 took place at a "separate time" and there were "marked differences in the nature of the underlying offenses charged." (Doc. 111 at 3); *cf. United States v. Williamson*, 482 F.2d 508, 511-12 (5th Cir. 1973) (defendant fled and injured an officer while leaving the parking lot where the deal took place).   Instead, the events of Count 3 were "clearly distinct in time [and] place," as the assault took place several months after the charged drug activity and at a place where no drug activity had occurred. *See Corbin*, 734 F.2d 643.

The charges were also largely distinct in evidence.  The only overlap between the two events is that the drug charges were the reason Szabo was attempting to arrest Mr. Hill. But that overlap does not mean that the entirety of the drug-related evidence would be admissible at a trial on Count 3.  At trial, the government presented over three days of testimony and evidence on the drug counts, all of which would not have been admissible just to establish that Mr. Hill had a federal warrant and did not want to be arrested.

23

Next, Mr. Hill's proffered testimony was clearly important. Mr. Hill wanted to pursue an affirmative defense, specifically, that he did not know that the victim was a federal officer and he acted on a good-faith belief that self-defense was necessary to protect against an assault by a private citizen. (Doc. 77 at 6-7; *see also* doc. 285 at 33 (Mr. Hill would testify that "he didn't know it was a lawful agent delivering a warrant.")). This is an available defense to an 18 U.S.C. § 111 charge. *See United States v. Alvarez*, 755 F.2d 830, 843 (11th Cir. 1985) (where an officer might reasonably be interpreted to be engaged in the unlawful use of force, "one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.").[1]

This defense makes the defendant's "state of knowledge" a "relevant consideration." *Id.* Mr. Hill's testimony was therefore important because he is the only person who could testify as to his knowledge—or lack thereof—at the time. *See United States v. Jordan*, 112 F.3d 14, 17 (1st Cir. 1997) (finding that severance should have been granted where the defendant wanted to

---

[1] Mr. Hill is not disputing that Agent Szabo identified himself as an agent, but instead, is asserting that, given the surrounding circumstances, he did not believe that Agent Szabo was actually a legitimate FBI agent.

24

present a good-faith defense to one charge because "only he can supply testimony of his subjective belief").

Finally, Mr. Hill showed a "strong need" not to testify on Counts 1 and 2. *See Corbin*, 734 F.2d at 648. Mr. Hill would have had difficulty providing context for or otherwise explaining calls, texts, and other activities that took place years before trial. Therefore, there was a significant risk that, even if Mr. Hill testified truthfully as to Count 3, the jury could have found him not credible in light of the drug evidence. Because the defense to the § 111 charge depended on his credibility, any questioning on the drug offenses that made the jury doubt his overall credibility would hurt his defense on the § 111 charge.

Because Mr. Hill's testimony was important to his defense on Count 3, and he showed a strong need not to testify as to the drug counts, the district court abused its discretion in denying the motion to sever. Indeed, the district court made the findings necessary to grant the severance motion. (*See* Doc. 111 at 7) (noting that his testimony "would be important" to his defense and that he "might suffer material prejudice if he is precluded from testifying").

After making these findings, the district court abused its discretion by attempting to craft "other relief" that was impossible to implement and would not have cured the prejudice even if successful. Indeed, the court later acknowledged that, although it asked the parties for reasonable ways to limit the scope of cross-examination, "there probably is none, frankly." (Doc. 229 at 25). Moreover, limiting the scope of cross-examination would allow the jury to draw negative inferences because the jury would know that he was specifically electing to not testify as to the drug counts, which could impact his credibility overall. *See Baker*, 401 F.2d at 976 ("a defendant's silence on one count would be damaging in the face of his express denial of the other."). As such, severance was the only solution, and the district court abused its discretion in denying Mr. Hill's motion.

The court's error resulted in compelling prejudice to Mr. Hill because he was forced to change his entire theory of defense after the severance motion was denied. Consistent with his statement, (doc. 32, exhs. 1-A, 2-1), Mr. Hill's proposed defense was that he did not believe that Szabo was an officer and instead thought he was being assaulted by a civilian and acted in self-defense. Because Mr. Hill was the only person who could testify to his own beliefs, he was unable to present this defense, and instead, had to

proceed with the defense at trial—a defense that the district court refused to even instruct on because there was no support in the law for it. (Doc. 228 at 135-37). But criminal defendants have "the right to present the defendant's version of the facts . . . to the jury so it may decide where the truth lies," which is a "fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). The district court's failure to sever the charges here precluded Mr. Hill from presenting his defense, infringing on his right to due process of law. This is compelling prejudice, and Mr. Hill's convictions must be vacated as a result.

## II. The evidence at trial established multiple conspiracies, not the single conspiracy charged in the indictment.

a. There was a material variance between the indictment and the government's evidence, which established at least two separate conspiracies.

"A material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996). This Court employs a two-step inquiry to determine whether a material and prejudicial variance occurred between the indictment and the proof. *United States v. Coy*, 19 F.3d 629, 633 (11th Cir. 1994). First, this Court, viewing the evidence in the light most favorable to

27

the government, inquires whether a reasonable jury could have determined beyond a reasonable doubt that a single conspiracy existed. *Id.* Second, this Court determines whether substantial prejudice resulted to the defendant if more than one conspiracy actually existed. *Id.*

To determine if the jury reasonably could have found a single conspiracy, this Court considers (1) whether a common goal existed, (2) the nature of the scheme underlying the crimes charged, and (3) the overlap of the participants. *Coy*, 19 F.3d at 633. Common means "similar" or "substantially the same," not "shared" or "coordinate." *United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997). However, it "is clearly not sufficient simply to say that the defendants each shared a common goal, to-wit: profit from the sale of [drugs]." *United States v. Glinton*, 154 F.3d 1245, 1251 (11th Cir. 1998). Instead, there must be "a single enterprise which sets up a common goal connecting each defendant." *Id.* (finding that supplier of drugs "engaged in several clusters of conspiracies" with the other defendants, who only had in common the same supplier). Even where there are "sub-groups" in a conspiracy, one conspiracy may exist; "[t]he key is to determine whether the different sub-groups are acting in furtherance of one overarching plan." *Calderon*, 127 F.3d at 1329.

28

In *Coy*, this Court held that no jury could have found that a single conspiracy existed where, after bales of marijuana were dropped from a plane, two separate boat crews retrieved the bales and then distributed the marijuana. *Coy*, 19 F.3d at 633. There, the Court held that there was a common goal—the importation of marijuana—but that the distribution schemes were distinct. *Id.* at 633-34. The Court emphasized that there was no overlap of participants in the two conspiracies. *Id.* at 634. Even evidence that the crew from one boat helped the other boat offload the marijuana was "simply insufficient to establish the existence of a single conspiracy in this case." *Id.*

1. **A properly instructed and reasonable jury could not have determined beyond a reasonable doubt that a single conspiracy existed.**

   a. <u>Mr. Hill was not a member of the NTG conspiracy.</u>

Here, a properly instructed and reasonable jury could not have determined beyond a reasonable doubt that a single conspiracy existed. Instead, there were obviously two separate conspiracies: the NTG conspiracy directed by Sartor, and a separate conspiracy involving Mr. Hill and Balcazar.

Specifically, the government's evidence plainly established the existence of the NTG conspiracy, which included the overall objective of furthering the gang, including by generating profits through the sale of controlled substances. (Doc. 223 at 65-66). Thompson testified that Sartor was in prison and that he contacted NTG members to help him get the drugs, store them, and distribute them. (*Id.* at 79; *see also id.* at 151 (describing the money "which Joseph Riley had been holding for Gary Sartor" and how Riley was "kind of the coordinator of" the money); doc. 224 at 7 ("the main benefactor of the whole thing was Gary Sartor" and "Clark was the facilitator and the go-between for that part."), 17 (Clark "was the intermediary to make sure that Sartor's drugs were purchased at the 759 Charlotte address")). Sartor used the 759 Charlotte Place address to store and sell his drugs. (Doc. 223 at 131-32, 151). This is consistent with the NTG members' own words. (*Id.* at 145 (Clark told Riley he was "fixing to bust a move" for Sartor)).

The evidence clearly suggests that Mr. Hill and Balcazar were separate and distinct from the NTG conspiracy. For example, after law enforcement seized $19,000 from the abandoned car in October, Clark told Riley that Migo—presumably referring to Balcazar—had to "go explain that to his people," plainly indicating that Balcazar was part of a different conspiracy.

(Gov't Exh. 005-14144A at 3). In a separate call, Riley, Sartor, and Clark's girlfriend discussed what to do after Clark was arrested, and the conversation made it clear that Mr. Hill was not part of their conspiracy. Specifically, Sartor discussed how he needed to get in touch with Clark's cousin, who "be with the Migo and them," and Sartor had to find Mr. Hill's phone number, as he did not have it before. (Gov't Exh. 006-751a at 5).

Addressing the three factors articulated by this Court, all three weigh in favor of Mr. Hill's argument. First, the conspiracies did not share a common goal. The NTG conspiracy had an overarching goal of furthering the purposes of the gang, as explained by the government's witnesses. NTG sold drugs in order to obtain funds *for the gang*, not simply to turn a profit. (Doc. 223 at 65-67). Because Mr. Hill was not part of NTG, he was not benefitting from any funds obtained by the gang.

Second, the nature of the schemes was different. The evidence suggests that Mr. Hill and Balcazar provided kilogram-quantities of controlled substances, presumably for resale. But there was no involvement in determining or directing how the resale occurred, nor any suggestion that Mr. Hill was involved in that process. Mr. Hill received no benefit from the further distribution of the drugs. In contrast, the NTG conspiracy had a clear

31

goal of distributing drugs in order to make money for and to further the status of the gang. (Doc. 224 at 60-61, 64-66). And the government's case agent acknowledged that gang members had to "go outside of the gang" to get the drugs. (Doc. 223 at 66). While Sartor sought to obtain, through Clark, controlled substances from Mr. Hill, that does not establish that Mr. Hill was aware of—or shared an interest in—the plan of distributing the substances in prisons. They certainly were not "acting in furtherance of one overarching plan." *Calderon*, 127 F.3d at 1329.

The fact that the NTG conspiracy purchased controlled substances from Mr. Hill and Balcazar does not establish a single joint conspiracy with all parties. *See United States v. Dekle*, 165 F.3d 826, 829 (11th Cir. 1999) ("Although the parties to the sales agreement may both agree to commit a crime, they do not have the joint criminal objective of distributing drugs."); *United States v. Swafford*, 512 F.3d 833, 841–42 (6th Cir. 2008) ("it is necessary to show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal" (cleaned up)). While the facts here did not involve user quantities of drugs, they also did not establish "a typical drug distribution scenario . . ., involving a large-volume seller, several mid-level distributors, and multiple street-level

dealers" that established a "common goal of maximizing the cash returns of the business through the distribution of the drugs." *United States v. Reeves*, 742 F.3d 487, 499 (11th Cir. 2014); *see also United States v. Abdelaziz*, 68 F.4th 1, 45-46 (1st Cir. 2023) ("We do not commonly infer, however, that a buyer shares a goal with a seller just because the two transact with one another.").

There is no evidence that Mr. Hill was involved in—or knew anything about—what would happen after he delivered the substances to Clark. Moreover, there was no indication that he stood to benefit from the later sale of the drugs—or that he suffered after the drugs were seized by law enforcement officers. *See United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) ("What is needed is proof that they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." (emphasis in original)). Therefore, the government's evidence established two conspiracies that interacted with each other, but did not share a common goal. *See United States v. Andrews*, 953 F.2d 1312, 1324-25 (11th Cir. 1982) (although defendant participated in an "entirely different conspiracy," there was not "one iota of evidence to support" the defendant's connection with the charged conspiracy); *cf. United States v. Reeves*, 742 F.3d 487, 498 (11th Cir. 2014) (extensive evidence of defendant's long-term relationships with

multiple co-conspirators and his repeated transfer of drugs showed participation in single conspiracy).

Finally, there was little to no overlap in the parties. There was obviously evidence that Clark called Mr. Hill to obtain the drugs, but otherwise, there was essentially no interaction between Mr. Hill and anyone else on the initial indictment—or other NTG members. *Cf. United States v. Holt*, 777 F.3d 1234, 1264 (11th Cir. 2015) (describing interactions between various members). As noted above, the calls admitted at trial establish that the NTG members did not know Mr. Hill or consider them to be part of their group. Notably, neither agent identified any calls in which Mr. Hill spoke directly to Sartor or even mentioned Sartor. (Doc. 224 at 38-40). In fact, even the NTG members acknowledged that Clark had probably told Mr. Hill not to interact with others—like Riley and Sartor—without Clark's involvement. (Gov't Exh. 06-792a at 3).

Instead, the evidence suggests a deep mistrust of Mr. Hill and Balcazar by the NTG members. In a November 5, 2016 call between Riley and Sartor, Sartor and Riley discussed Mr. Hill. (Doc. 225 at 43; Gov't Exh. 06-792a). Riley described Migo as "Ced's folk," and suggested significant distrust between them. (*Id.* at 4-5). Specifically, Migo and Mr. Hill had come to sell

34

Riley a firearm, and Riley had made sure that another person had a firearm before Migo came in the house.  (*Id.*).  Riley stated that he did not trust them to come inside, and "they had a car full of Migos outside" in case Mr. Hill and Migo did not make it back out.  (*Id.* at 5-6).  Sartor asked why they were acting like that, and Riley responded, "Shit, they don't know us."  (*Id.* at 6).  Instead, Mr. Hill and Migo only knew that Riley had just bought the two bricks, but that it was short.  (*Id.* at 6).  Riley responded, "I mean that how a n----- do, you know. . . Two times, third time them rob ya.  You know how that shit goes."  (*Id.* at 6-7).

In a different call, Riley and another caller briefly suggested Mr. Hill was working for the police—and that Sartor was wondering if that was the truth.  (Gov't Exh. 06-988a at 4, 7).  Riley and Sartor then had a much longer conversation in which they discussed whether Mr. Hill and Balcazar were working with law enforcement, referring to "Ced's bitch ass."  (Doc. 225 at 56-57; Gov't Exh 6-1262a).  Although Szabo testified that Riley qualified that suggestion, given that they had brought additional narcotics to make up for the shortage, (doc. 225 at 57), Sartor emphasized that he believed that Mr. Hill and Migo were working for the police, (Gov't Exh. 6-1262a at 12-13).

35

Plainly, the evidence does not establish that Mr. Hill and Balcazar were in the same conspiracy as Sartor and the other NTG members.

The Sixth Circuit has found a material variance in a similar situation. In *United States v. Mize*, 814 F.3d 401, 410-12 (6th Cir. 2016), that Court vacated the defendants' convictions because "[t]hey were forced to defend against a conspiracy" involving a different organization, which was "totally separate" from the conspiracy that the defendant was allegedly in where the government "presented an extraordinary volume of evidence about the" uncharged conspiracy. For all of these reasons, this Court should hold that there was a material variance between the indictment and the evidence presented at trial.

    b. <u>At most, there was a rimless hub-and-spoke conspiracy, with Sartor at the hub.</u>

Mr. Hill does not agree that he was not in a conspiracy with Sartor. However, at most, there was a hub-and-spoke conspiracy with Sartor at the hub. In a hub-and-spoke conspiracy, "a key man or hub directs and coordinates the activities and individual efforts of various combinations of people." *United States v. Barsoum*, 763 F.3d 1321, 1330 (11th Cir. 2014) (cleaned up); *United States v. Pacchioli*, 718 F.3d 1294, 1303 (11th Cir. 2013) (in a hub-and-spoke conspiracy, "a central core of conspirators . . . recruits

36

separate groups of co-conspirators to carry out the various functions of the illegal enterprise"). The facts above plainly establish that Sartor was running a hub-and-spoke conspiracy from the prison, using various individuals to execute his drug-distribution ring.

To the extent that Mr. Hill was part of the conspiracy, he was at most a spoke who was unaware of the other spokes. Where a defendant is a spoke, rather than a key man or the hub, "he must have knowledge of the other spokes in order to be properly convicted of a single, overarching conspiracy with those other spokes." *Barsoum*, 763 F.3d at 1330; *see also Kotteakos v. United States*, 328 U.S. 750, 754-55 (1946) (the government had proved a series of conspiracies where the single connection between the purported spokes was the key defendant and there was no additional connection between the spokes, who were unaware of each other); *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004) (emphasizing that "for a wheel conspiracy to exist, those people who form the wheel's spokes must have been *aware* and must do something in furtherance of some single, illegal enterprise"). Because Mr. Hill was not participating in a "single, illegal enterprise," the evidence at trial established multiple conspiracies. *Pacchioli*, 718 F.3d at 1303 (if the spokes do not know about each other, "there is not a single conspiracy, but

37

rather as many conspiracies as there are spokes." (cleaned up)). Accordingly, there was a material variance between the charge in the indictment and the evidence presented at trial.

### 2. Mr. Hill was prejudiced by the material variance from the indictment.

To determine if the variance prejudiced the defendant's substantial rights, this Court determines whether (1) the proof at trial differs so greatly from the charges in the indictment that the defendant is unfairly surprised and has an inadequate opportunity to prepare a defense; or (2) there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury transferred evidence from one conspiracy to a defendant involved in another conspiracy. *Coy*, 19 F.3d at 634; *see also Glinton*, 154 F.3d at 1250-52 ("the possible prejudice to defendants is the liberality of proof provided to the government by allowing evidence of other crimes and criminal activities undertaken by co-defendants").

Here, Mr. Hill was harmed in both ways outlined by this Court. First, he was unfairly surprised because the government was allowed to introduce substantial evidence about NTG—evidence that should not have been admitted if the government were only presenting evidence about the

38

conspiracy of which Mr. Hill was actually a part. The government began the trial by introducing inflammatory evidence about NTG and its history through the first witness. (Doc. 223 at 52-65). Although Mr. Hill was aware that *some* gang evidence was going to be admitted, he was clearly surprised by the amount of gang evidence that was admitted, as he objected on relevance grounds. (*See* doc. 223 at 62-63). Shortly thereafter, the court *sua sponte* directed the government to limit the NTG evidence, although the government continued to present substantial amounts of evidence about the gang. (*Id.* at 63-64).

Second, there is a substantial likelihood that the jury transferred evidence from the NTG members to Mr. Hill for two reasons. Most importantly, by virtue of charging Mr. Hill in one conspiracy with all the other NTG members, the government was able to bring in enormous amounts of co-conspirator hearsay, which it otherwise would not have been able to admit, as argued in more depth below. Briefly, though, because Mr. Hill was *not* a member of the NTG conspiracy, the government should not have been able to admit hearsay from members of the NTG conspiracy under Federal Rule of Evidence 801(d)(2)(E). *United States v. Wenxia Man*, 891 F.3d 1253, 1271 (11th Cir. 2018). This included wiretapped phone calls that did

39

not involve Mr. Hill in any way, which the government's case agents then explained in great detail. (*See, e.g.*, doc. 223 at 133-45; doc. 224 at 16-17, 31, 155-59; doc. 225 at 27-32, 36-37; Gov't Exh. 006-751a).   Because the government admitted co-conspirator hearsay due to Mr. Hill's purported membership in the NTG conspiracy and because the government then used those conversations in order to argue that Mr. Hill was guilty on the drug counts, it is obvious that the jury transferred evidence from the NTG members to Mr. Hill—at the express urging of the government.

Further, the jury heard significant prejudicial evidence about NTG. Indeed, this is how the government began its case—by explaining how NTG started, how the investigation into NTG began, and all the types of crimes that NTG committed.  Further, the government repeatedly emphasized the sinister nature of NTG's activities, including, *inter alia*, that they had killed people, that they had been investigated and charged with murder, that they were not deterred from distributing drugs despite being incarcerated. The jury heard evidence that numerous NTG members charged as Mr. Hill's coconspirators were responsible for similar crimes, including Clark and Sartor.  Given that Mr. Hill was not a member of NTG and the lack of a limiting instruction, the unfair and substantial prejudice to Mr. Hill is clear.

40

Indeed, this Court has emphasized the prejudicial nature of this type of evidence. *See United States v. Jernigan*, 341 F.3d 1273, 1284-85 (11th Cir. 2003) (noting that "modern American street gangs are popularly associated with a wealth of criminal behaviors and social ills"), *abrogated in part on other grounds by Rehaif v. United States*, 588 U.S. 225 (2019); *see also United States v. Johansen*, 56 F.3d 347, 350-52 (2d Cir. 1995) (finding prejudice where the multiple conspiracies permitted the government to introduce of violence and mob connections, including what the Court referred to as a co-defendant's "brutality").

Mr. Hill has identified clear and specific harm from the material variance in this case. Because Mr. Hill has established that the evidence at trial was a material variance and that he was prejudiced by this variance, this Court should vacate his conspiracy conviction.

   b. The district court plainly erred by not giving a multiple conspiracies instruction.

Generally, a multiple conspiracies instruction is required where, despite a single overall conspiracy charge, the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment. *Calderon*, 127 F.3d at 1328. The issue of whether

41

a multiple conspiracies instruction should have been given is different from whether a reasonable jury could have concluded beyond a reasonable doubt that a single conspiracy existed. *Id.* at 1328-29. Instead, this issue asks whether "that same jury could also have reasonably concluded from the evidence that multiple conspiracies, rather than the single charged conspiracy, existed. The answer to the former does not necessarily dictate the answer to the latter." *Id.* at 1329.

Here, the court plainly erred by not instructing the jury that, if the evidence supported a finding that there were multiple conspiracies, not just the one charged in the indictment, it should find Mr. Hill not guilty on the conspiracy charge. Even if the Court does not agree that this was the *only* conclusion from the government's evidence, there was certainly substantial evidence from which a jury could have concluded that multiple conspiracies existed, as noted at length above. *See Calderon*, 127 F.3d at 1230.

Further, the error was plain after, *inter alia*, *Calderon*. At least one other Circuit has found that the failure to give a multiple conspiracies instruction rises to the level of plain error. *United States v. Lapier*, 796 F.3d 1090, 1097-98 (9th Cir. 2015) ("Because the evidence in this case tended to show multiple conspiracies instead of the single charged conspiracy, the failure to give a

specific unanimity instruction[2] was plain error."); *see also United States v. Stowell*, 947 F.2d 1251, 1257-59 (5th Cir. 1991) (failure to give multiple conspiracies instruction required reversal where there was evidence from which a jury could conclude that the defendant was a participant in one conspiracy, but not the other).

The error affected Mr. Hill's substantial rights because, if the jury had been properly instructed, there is a reasonable likelihood that Mr. Hill would have been acquitted on the conspiracy charge. Given the substantial and compelling evidence that the NTG conspiracy existed and operated entirely separate from Mr. Hill, the jury likely would have concluded that there were two separate conspiracies, such that acquittal was required. Because a properly instructed jury is critical to the functioning of the criminal justice system, the error also seriously affected the fairness, integrity, or public reputation of the judicial proceedings. For all of these reasons, this Court should vacate and remand Mr. Hill's conviction on the conspiracy count.

---

[2] The challenged instruction would have required the jury to be unanimous as to which conspiracy was the basis for the conviction. *See Lapier*, 796 F.3d at 1095-96.

43

c. The district court plainly erred by admitting statements from NTG members because it did not constitute co-conspirator hearsay.

Under Federal Rule of Evidence 801(d)(2)(E), the government may admit statements against a defendant if it was made by the defendant's coconspirator during and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). The government must establish by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included both the declarant and the defendant, and (3) the statement was made during the course of and in furtherance of the conspiracy. *Wenxia Man*, 891 F.3d at 1271.

The district court plainly erred by admitting co-conspirator hearsay statements from the NTG conspiracy members because Mr. Hill was not a member of that conspiracy. The government did not meet its burden to prove by a preponderance that Mr. Hill was in a conspiracy with each NTG member that was a declarant in the wiretapped calls, including but not limited to, Sartor, Riley, and more. Even assuming *arguendo* that Mr. Hill was in a conspiracy with Clark, that does not make Mr. Hill coconspirators with every member of NTG, as argued at length above. Because Mr. Hill was not in a conspiracy with the other NTG members, the out-of-court statements of those individuals were not admissible under Rule 801(d)(2)(E).

44

This error was plain, given this Court's clear caselaw that both the declarant and the defendant must be a member of the same conspiracy. *See Wenxia Man*, 891 F.3d at 1271. Further, the error affected Mr. Hill's substantial rights because it allowed the government to introduce a wide variety of statements made by various NTG members that were otherwise inadmissible. Without the improperly admitted statements, the jury would not have heard, for example, calls between Riley and Sartor. (*See, e.g.*, doc. 223 at 133-45; doc. 224 at 16-17, 31, 155-59; doc. 225 at 27-32, 36-37; Gov't Exh. 006-751a). Given that the jury heard substantial evidence that should not have been admitted at trial, the plain error also seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Russell*, 957 F.3d at 1252. Notably, the improper admission of this testimony affected not just the conspiracy conviction, but all of the counts on which Mr. Hill was convicted. This Court should therefore vacate all of Mr. Hill's convictions and remand for further proceedings.

## III. The district court plainly erred by admitting improper testimony through the case agents.

Federal Rule of Evidence 702 allows expert opinion testimony so long as the witness is qualified by his "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Experience can be the basis of a witness'

45

expertise.  *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (*en banc*).  In contrast, lay opinion is admissible only if the opinions are (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  Fed.R.Evid. 701; *see also* Fed.R.Evid. 602 (requiring witness to have personal knowledge of testimony).

This Court has held that, "a case agent testifying as a lay witness may not explain to a jury what inferences to draw from recorded conversations involving ordinary language.  At that point, his testimony is no longer evidence but becomes argument."  *United States v. Hawkins*, 934 F.3d 1251, 1265-67 (11th Cir. 2019) (quotation omitted). In *Hawkins*, this Court determined that the trial court had plainly erred by admitting improper testimony, regardless of how it was classified.  934 F.3d at 1265-67 ("Put simply it matters not how [the agent] or his testimony is classified.  Expert or lay, the testimony was improper, and admitting it constituted clear and obvious error.").

The Court in *Hawkins* emphasized that opinion testimony "is not properly received merely to tell the jury what result to reach."  *Id.* at 1266

46

(cleaned up) (witnesses cannot "draw inferences from the evidence that the jury must draw (or not draw) for itself"). Interpreting *clear* statements is barred by the helpfulness requirement of Rule 701, for lay witnesses, and 702, in the expert context. *Id.; see also United States v. Haines,* 803 F.3d 713, 734 (5th Cir. 2015) (finding testimony was admitted in error where agent "offer[ed] his own interpretation of language that was well within the province of the jury to interpret" and "ventured into speculation, usurping the jury's function, which is to draw its own inferences from the evidence presented"). Thus, an agent cannot provide "speculative interpretive commentary on the meanings of entire conversations, as opposed to construing just drug code words during the conversations," if so qualified. *United States v. Pendergrass,* 995 F.3d 858, 880 (11th Cir. 2021).

In *Hawkins,* the Court explained that it was forced to correct the error and to vacate the defendants' convictions to prevent "overzealous presentation of improper testimony. . If such testimony were allowed, there would be no need for the jury to review personally any evidence at all." *Id.* at 1268-69. Instead, the jurors would be "helped" by a government witness, "who could not only tell them what was in the evidence but tell them what

47

inferences to draw from it." *Id.* ("Fundamental notions of fairness and justice forbid us from countenancing such a procedure.").

In subsequent cases, this Court has emphasized *Hawkins* turned in part on the fact that the expert testified to both matters of fact and to expert opinion. *Pendergrass*, 995 F.3d at 880. This Court has subsequently found error where an agent "erroneously translated what 'real crazy' and 'making no money' meant, instead of allowing the jury to interpret these plain-English phrases on its own." *United States v. Perry*, 14 F.4th 1253, 1265 (11th Cir. 2021) (finding that plain error did not affect the defendant's substantial rights due to the jury's instructions and that was "more than enough" evidence to establish the charges).

   a. <u>The case agents provided improper opinion testimony while also testifying as fact witnesses.</u>

Here, the district court plainly erred by permitting the case agents to testify as both fact and quasi-expert witnesses — meaning that they provided plainly expert testimony without being qualified as such while also testifying to the facts. Indeed, the government established their expertise by having them recount their extensive training and experience, particularly with gangs. (*See* doc. 223 at 53-61, 66, 122; doc. 224 at 87-94; *see also* doc. 225 at 97 (district court noting that Szabo had been "testifying here based on

your very active and lengthy involvement in dealing with law enforcement in that world")).  Further, when Mr. Hill objected to improper testimony from the agent as beyond the scope of the testimony he was qualified to give, the government then laid a foundation—essentially establishing his expertise to answer the question.  (Doc. 223 at 122-26).  Finally, Thompson admitted that while he had not been qualified as an expert, he was "being put up here for my expertise and knowledge of this case," and that he had been qualified as an expert in other court proceedings.  (Doc. 224 at 81).

Further, both case agents testified to information that they did not necessarily have personal knowledge of, acting as improper summary witnesses.  They developed their expertise testimony by listening to thousands of hours of wiretapped conversations and reading letters and emails, at least some of which must have been unrelated to this trial and not admitted into evidence.  (Doc. 223 at 58; Doc. 224 at 98).

They provided clearly expert testimony.  The case agents both testified generally about activities that gangs and NTG in particular engaged in.  (Doc. 223 at 58-62, 64-65).  This included repeating that NTG engaged in criminal activity for the purpose of making money, including drug dealing, but also violent crime, including murder and aggravated assaults.  (*Id.* at 64-

66).  Thompson provided extensive information about the background of NTG, despite the fact that Mr. Hill was not a member, and despite not having personal knowledge of the history of the gang.  (Doc. 223 at 61-66, 113-16).

The agents testified about activities within NTG, despite not having personal knowledge of them. Thompson testified about the overarching investigation into NTG, including that the investigation began because Gwinnett County Police Department believed that inmate and NTG member Gordan Evans had ordered the murder, resulting in the arrest and charges of multiple people.  (Doc. 223 at 61-62).  Further, they repeatedly testified that various members were "fifth floor" leaders of the NTG and that Clark and Mr. Hill were cousins by blood.  (Doc. 223 at 68-69, 78-79 (Joseph Riley "had pretty much ultimate authority for this gang"), 118, 132; doc. 224 at 94-94-97, 167).  Although they may have learned this information during their investigation, that does not make them qualified to testify to it, as opposed to witnesses who had personal knowledge of it.  Holding otherwise would allow agents to testify to all relevant facts without requiring witnesses with personal knowledge to testify—exactly what *Hawkins* was concerned with.

The improper testimony also included overtly prejudicial information, like that law enforcement had obtained Clark's phone number because they

believed that they had facilitated the murder in Gwinnett County, after noting repeatedly that Clark was Mr. Hill's cousin. (Doc. 223 at 70, 75-77, 92). Although some unspecified agent may have heard the phone call that contained Clark's phone number, the basis for the agent's testimony that Clark was involved in ordering the murder was not clear. (*Id.* at 76-78).

The agents were able to repeatedly testify about the conclusions of the law enforcement investigation, rather than presenting the jury with the facts and letting them reach the ultimate conclusions. In one call, Mr. Hill stated that he had to "pull up to Bankhead," and Thompson testified that, based on his knowledge of this investigation, the thousands of countless hours of wire that you have listened to," they had identified an address off Bankhead Highway—759 Charlotte Place, Atlanta, GA. (*Id.* at 130-31). Riley, "the other fifth floor in the gang," rented the address, but it was used for "the storage, sell, and distribution of narcotics as well as gang hangouts and meetings from occasion based on the phone calls." (*Id.* at 130-32, 145). Unlike in other cases where the agent properly summarized records, the agents here testified to information that was not gained through personal experience, like reviewing bank records. *See United States v. Franklin*, 2022 WL 5337453, at *1-2 (11th Cir. Oct. 7, 2022). Instead, the agents admitted that much of

51

their knowledge about the case came through interviewing other people, and reviewing hearsay.

The case agents also testified to the ultimate conclusions that should have been left for the jury to decide. For example, the government asked Thompson about Mr. Hill's role in the investigation, and he responded that Mr. Hill was the "broker and supplier to Tyrone Clark, who as the fifth floor of the Nine Trey Bloods at the time." (Doc. 223 at 69). Thompson and Szabo testified that every time "Migo" was used in this case, Mr. Hill was referring to Balcazar. (*Id.* at 119-20, 122, 129, 130, 133, 145; *see also* doc. 224 at 114, 142; doc. 225 at 55, 54).

The agents extensively interpreted phone calls being played for the jury. (Doc. 223 at 121-45; doc. 224 at 7-37, 109-56). While some of the terms may have been outside the ken of the average juror, (doc. 223 at 122-23 ("Watson," "jugg")), much of the testimony involved interpreting language that average jurors should have been able to understand, (Doc. 224 at 10-11 ("blued us," "high speed"); 165-66 (he "ain't pulled up yet" means "he hasn't gotten there yet"). This distinguishes the testimony here from the testimony challenged in *Pendergrass. See Pendergrass*, 995 F.3d at 881 (agent "also did

not purport to have expert knowledge of the subtext of entire conversations consisting of everyday language, like the agent in *Hawkins* did").

For example, Szabo testified that, when Mr. Hill stated that "man, listen man, me and Migo and his bitch, man, we laid in a ditch behind that abandoned house for three hours," he was referring to himself, Balcazar, and Balcazar's "girl associate," and that the three of them were "hiding in a ditch after abandoning the car by an abandoned house." (Doc. 224 at 140). When Mr. Hill said that "them folks stepped on my fucking hand," he was "talking about the police who are walking through the neighborhood, myself included, looking for him – out on foot with a K-9 looking for them." (*Id.* at 142).

The government had Szabo interpret entire phone calls at length, despite fact that the participants were clearly discussing how to divide up various drugs that they had. (Doc. 224 at 162-65). In another call, when Clark told Riley that he had told them to "make sure it's all there," Szabo testified that this "obviously indicates that he trusts Mr. Hill because he is not counting it up directly but basically told him make sure it is there and make sure it is dry." (*Id.* at 167).

There were multiple calls about ensuring that the courier—Morgan/Boot—could get the drugs from 759 Charlotte Place address when they were locked in a closet and Riley was unavailable. (Doc. 225 at 15-18; Gov't Exh. 666a, 667a, 06-692a). Despite the contents of the calls being clear, the government had Szabo explain them to the jury. (*Id.* at 18). In a subsequent call, Riley told Morgan, "he got it open, bro," and Szabo explained that this meant, "He is letting him know he got the closet open so the drugs are ready to go." (*Id.* at 19; Gov't Exh. 06-692a). Regarding another call, the government asked, "it talks about a girl who is coming to pick up some drugs. What is happening there?" (Doc. 224 at 158). Szabo responded, "so there is a female who is coming to get the drugs to be delivered to another customer, and she is going to be picking up both marijuana and methamphetamine." (*Id.*).

When Mr. Hill was allegedly bringing the makeup amount of methamphetamine, Riley messaged Sartor that "he on the way," and Szabo testified that this was referring to Mr. Hill being on the way with the methamphetamine. (Doc. 225 at 45-46). The government then played a call between Riley and someone else before Mr. Hill called and said that he was at the door; Riley told the other person, "Let me grab the ice cream real quick.

54

I'm gonna hit you right back." (*Id.* at 4-5; Gov't Exh. 6-900a). Szabo "explained" that Riley was "going to grab the methamphetamine that Cedrick Hill is at the door with. He is just going to grab it real quick." (*Id.* at 47). The meaning of these conversations are clear and did not require additional explanation.

Regarding the call with Sartor, Riley, and Clark's girlfriend, Szabo testified that they were referring to Mr. Hill, and that Sartor stated that he had lost $30,000 because he had lost 3 kilograms of methamphetamine at $10,000 apiece. (Doc. 225 at 38). Szabo explained that Sartor was "already in a mode of needing to make up that money in some way." (*Id.* at 39). Szabo explained that they had held back one kilogram, so Sartor "wants to send that back down what will ultimately be the following day to make as much money as he can." (*Id.*). Szabo explained that they had taken out several ounces for a female and for a "gang member who just got out of prison," and that Sartor was "trying to essentially reconstruct a full kilogram of methamphetamine to send that down to Double M, Marcus Russell, to make as much money as he can because of his loss." (*Id.* at 39-40). The contents of the call were clear, but Szabo also added additional details, like that several ounces had been held for a female and for a "gang member who just got out

55

of prison." (*Id.* at 39). Moreover, Thompson testified definitively about the speakers' intent, noting for instance that Clark was asking for two kilograms of methamphetamine. (*Id.*).

Here, there was error, as described above, and it was plain after, *inter alia, Hawkins*. *Hawkins* was based largely on the fact that the testimony in question was the bulk of the evidence against the defendant. *See United States v. Wall,* 116 F.4th 1285, 1308 (11th Cir. 2024) (noting that the government in that case presented 27 witnesses). Here, though, a substantial portion of the testimony against Mr. Hill was the testimony by Thompson and Szabo, and they blurred the lines between fact witnesses and expert witnesses—and they were certainly the bulk of the testimony as it related to the drug counts. Further, here, there no limiting or cautionary instructions regarding the agents' testimony. *Cf. Perry*, 14 F.4th at 1268 (jury was instructed multiple times on how to evaluate the opinion testimony). The error affected Mr. Hill's substantial rights because the jury heard extensive improper testimony that told them what result to reach, rather than allowing the jurors to make those conclusions themselves. This error affected the fairness, integrity, and public reputation of the judicial proceedings for the

56

same reasons as in *Hawkins*. For these reasons, this Court should vacate Mr. Hill's convictions.

  b. The government admitted documents that constituted improper hearsay and violated the Confrontation Clause.

Finally, case agents testified to inadmissible hearsay and/or evidence that violated the Confrontation Clause. *See* Fed.R.Evid. 801(a), 802. The witness does not have to explicitly testify that he or she is reciting what another person said for the testimony to be hearsay, so long as it is clear that the witness discovered the information through other people's statements. *United States v. Ransfer*, 749 F.3d 914, 925 (11th Cir. 2014). The admission of hearsay that is testimonial is also barred by the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004); *Davis v. Washington*, 547 U.S. 813, 821-22 (2006).

The government introduced testimony through law enforcement officers about extraction reports from phones that they did not produce themselves. This includes Mr. Hill's supposed phone recovered after his arrest, (doc. 228 at 12-13; Gov't Exhs. 85A-85K), and the information from his phone that the government used to corroborate the Rule 404(b) witness' testimony, (doc. 225 at 58-60; doc. 226 at 79-84, 88-95; Gov't Exhs. 89A-K). This violated Mr. Hill's right to be convicted without the improper

57

admission of hearsay and his Confrontation Clause rights.  It is plain error

after, *inter alia*, *Smith v. Arizona*, 602 U.S. 779, 783 (2024) (testimony

conveying work performed by a non-testifying witness is offered for truth

of the matter if testimony depends the work being accurate). The error

affected Mr. Hill's substantial rights because, inter alia, the government used

the improperly admitted evidence as proof of Mr. Hill's knowledge that he

was wanted and to corroborate the Rule 404(b) witness.  Given the prejudice

to Mr. Hill, the error also significantly affected the fairness, integrity, or

public reputation of the judicial proceedings.

## IV.   The cumulative prejudice from the errors identified above requires reversal.

Mr. Hill submits that the errors identified above require reversal

individually.   However, if this Court were to conclude otherwise, the

cumulative error doctrine demands that Mr. Hill's convictions be reversed.

"The cumulative error doctrine provides that an aggregation of non-

reversible errors (i.e., plain errors failing to necessitate reversal and harmless

errors) can yield a denial of the constitutional right to a fair trial, which calls

for reversal."  *United States v. Mosquera*, 886 F.3d 1032, 1052 (11th Cir. 2018).

Here, the refusal to sever the trial, combined with the improperly admitted

agent testimony and coconspirator hearsay and the failure to instruct the jury

on multiple conspiracies, combined to prejudice Mr. Hill, such that this Court must vacate his convictions.

**V.   Mr. Hill's sentence is substantively unreasonable because the district court expressly considered an impermissible sentencing factor—the fact that Mr. Hill exercised his constitutional right to trial—when imposing sentence.[3]**

A court imposes a substantively unreasonable sentence when it, *inter alia*, gives an improper or irrelevant factor significant weight. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*); *United States v. Pugh*, 515 F.3d 1179, 1191-92 (11th Cir. 2008). Although deferential, this Court's "review is not toothless." *United States v. Plate*, 839 F.3d 950, 956 (11th Cir. 2016). A sentence based entirely upon an impermissible factor is unreasonable because such a sentence does not achieve the purposes of § 3553 (a). *United States v. Velasquez Velasquez*, 524 F.3d 1248, 1252 (11th Cir. 2008) (immigration status is an improper factor); *see also Plate*, 839 F.3d at 957-58 (ability to pay restitution is an improper factor).

---

[3] Mr. Hill's substantive reasonableness challenge is preserved for review because Mr. Hill preserved a substantive reasonableness challenge at sentencing. (Doc. 290 at 147); *United States v. Curtin*, 78 F.4th 1299, 1319 (11th Cir. 2023) (Newsom, J., concurring) ("With respect to errors . . . bearing on a sentence's substantive reasonableness, we have recognized that a general blanket objection suffices to preserve the error for appeal.").

"An accused cannot be punished by a more severe sentence because he unsuccessfully exercised his constitutional right to stand trial rather than plead guilty." *Baker v. United States*, 412 F.2d 1069, 1073 (5th Cir. 1969); *Smith v. Wainwright*, 664 F.2d 1194, 1196 (11th Cir. 1981) ("Certainly, the Constitution forbids the exaction of a penalty for a defendant's unsuccessful choice to stand trial."). "The augmentation of sentence based on a defendant's decision to stand on his right to put the Government to its proof rather than plead guilty is clearly improper." *United States v. Hutchings*, 757 F.2d 11, 14 (2d Cir. 1985) (cleaned up) (emphasizing the "total waste" of resources caused by going to trial). "The courts must not use sentencing power as a carrot and stick to clear congested calendars, and they must not create the appearance of such a practice.'" *United States v. Medina-Cervantes*, 690 F.2d 715, 716 (9th Cir. 1982) (cleaned up).

Here, Mr. Hill's sentence was substantively unreasonable because the district court expressly considered the fact that Mr. Hill went to trial and imposed a 312-month sentence, at least in part, because Mr. Hill "didn't basically come to some agreement earlier on." (Doc. 290 at 139-41). The court expressly rejected Mr. Hill's arguments that Clark and Sartor were responsible for more premeditated and violent acts, by stating that "[t]hey

entered into a deal . . . [Y]ou could have entered into a deal too." (*Id.* at 140). The court improperly considered the "enormous resources" required to try this case, and strongly suggested that the case should have been resolved with a guilty plea. (*Id.* at 140 ("I don't know what your thought process was. . . . But there was a lot of evidence against you—a lot"); *Hutchings*, 757 F.2d at 13-14. Because the court punished Mr. Hill more severely because exercised his constitutional right to stand trial, the sentencing violated his Sixth Amendment rights, and was based on an impermissible factor. *See Baker*, 412 F.2d at 1073.

There can be no meaningful dispute that the Mr. Hill's sentence would have been shorter but for the district court's improper consideration of his decision to go to trial, given the court's express statements at sentencing. Consequently, Mr. Hill has established that he was harmed by the court's consideration of an improper factor—and the exercise of a constitutional right, no less. This Court should vacate his sentence and remand for further proceedings.

## CONCLUSION

This Court should vacate Mr. Hill's convictions and sentences and remand for further proceedings.

Dated: This 23rd day of June, 2025.

Respectfully submitted,

/s/ Leigh Ann Webster
Leigh Ann Webster
Georgia Bar No. 968087

/s/ Sydney R. Strickland
Sydney R. Strickland
Georgia Bar No. 418591
Attorney for Cedrick Hill

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile: (404) 393-3617
law@stricklandwebster.com

## CERTIFICATE OF COMPLIANCE

This brief contains 12,915 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief was filed by uploading it with the Eleventh Circuit's Electronic Filing System which will automatically serve opposing counsel with the Brief.

Dated:  This 23rd day of June, 2025.

/s/ Leigh Ann Webster
Leigh Ann Webster
Georgia Bar No. 968087
Attorney for Cedrick Hill

STRICKLAND WEBSTER, LLC
830 Glenwood Ave SE
Suite 510-203
Atlanta, GA 30316
Telephone: (404) 590-7967
Facsimile: (404) 393-3617
law@stricklandwebster.com